William ALLEN, Plaintiff,

v.

EL PASO PIPELINE GP COMPANY, L.L.C., Ronald L. Kuehn, Jr., James C. Yardley, John R. Sult, Douglas L. Foshee, D. Mark Leland, Arthur C. Reichstetter, William A. Smith, and El Paso Pipeline Partners, L.P., Defendants,

and

El Paso Pipeline Partners, L.P., Nominal Defendant.

C.A. No. 7520–VCL.

Court of Chancery of Delaware.

Submitted: March 28, 2014.

Decided: May 19, 2014.

Jessica Zeldin, Rosenthal, Monhait & Goddess, P.A., Wilmington, Delaware; Samuel H. Rudman, Mark S. Reich, Michael G. Capeci, Robbins Geller Rudman & Dowd LLP, Melville, New York; Randall J. Baron, Robbins Geller Rudman & Dowd LLP, San Diego, California; Ethan D. Wohl, Wohl & Fruchter LLP, New York, New York; Attorneys for Plaintiff.

Peter J. Walsh, Jr., Brian C. Ralston, Berton W. Ashman, Jr., Gerard M. Clodomir, Matthew R. Dreyfuss, Potter Anderson & Corroon LLP, Wilmington, Delaware; Attorneys for Defendants El Paso Pipeline GP Company, L.L.C. Douglas L. Foshee, Ronald L. Kuehn, Jr., D. Mark Leland, Arthur C. Reichstetter, William A. Smith, John R. Sult, and James C. Yardley.

Lewis H. Lazarus, Thomas E. Hanson, Jr., Morris James LLP, Wilmington, Delaware; Attorneys for Defendant and Nominal Defendant El Paso Pipeline Partners, L.P.

## OPINION

LASTER, Vice Chancellor.

On March 4, 2011, El Paso Pipeline Partners, L.P. (the "Partnership" or "El Paso MLP") acquired a 25% interest in Southern Natural Gas Co. ("Southern") from El Paso Corporation ("El Paso Parent"), the parent company of the Partnership's general partner, El Paso Pipeline GP Company, L.L.C. (the "General Partner"). The plaintiff has challenged the transaction, claiming that the defendants violated both their express contractual obligations and the implied covenant of good faith and fair dealing, or alternatively aided and abetted those wrongful acts. Counts I and III of the complaint assert those theories as direct claims, and the plaintiff has moved to certify a class consisting of all holders of El Paso MLP common units as of March 4, 2011, together with their successors and assigns, excepting the defendants and their affiliates (the "Class"). The defendants oppose the motion, arguing that the plaintiff's claims

are exclusively derivative. This decision grants the motion for class certification.

# I. FACTUAL BACKGROUND

The facts are drawn from the materials presented in support of the motion for class certification. Also currently pending is a motion for summary judgment filed by the defendants. The parties have briefed that motion fully, and portions of the factual background are drawn from the more extensive submissions that accompanied it.

## A. The Partnership

El Paso MLP is a Delaware limited partnership headquartered in Houston, Texas. El Paso MLP operates as a master limited partnership ("MLP"), which is a short-hand term for a publicly traded limited partnership that is taxed as a pass-through entity for federal income tax purposes. El Paso MLP owns interests in companies that operate natural gas pipelines and storage facilities throughout the United States. Its common units trade on the New York Stock Exchange under the symbol "EPB."

MLPs that focus on transporting and storing oil and natural gas, like El Paso MLP, are commonly referred to as midstream MLPs. Midstream MLPs are typically "sponsored" by a corporation with MLP-qualifying assets that generate stable cash flows. The sponsor seeks to maximize the market valuation of those assets by transferring them to an MLP that can issue publicly traded securities on the strength of the cash flows and distribute the cash periodically to investors in a tax efficient manner. In the typical structure, the sponsor owns 100% of the general partner of the MLP, giving the sponsor control over the MLP. The sponsor contributes an initial block of assets to the MLP and, over time, sells additional assets to the MLP. Because the assets move from the sponsor level down to the MLP level, the sales are referred to colloquially as "drop-downs."

In August 2007, El Paso Parent formed El Paso MLP and contributed to El Paso MLP a number of properties. On November 15, El Paso MLP announced its initial public offering of 25,000,000 common units. The IPO prospectus cautioned that El Paso Parent would have no obligation to drop down additional assets into El Paso MLP. Despite this disclosure, El Paso Parent was plainly creating a sponsored MLP, implying that El Paso MLP over time would acquire assets that El Paso Parent owned.

Consistent with the typical MLP structure, El Paso Parent owned and continues to own 100% of the General Partner. The General Partner in turn owned and continues to own a 2% general partner interest in El Paso MLP. The general partner interest provides the General Partner with a 2% economic interest in El Paso MLP, but more importantly gives the General Partner control over El Paso MLP. At the time of the transaction challenged in this litigation, El Paso Parent also owned, either through the General Partner or its affiliates, approximately 48.9% of El Paso MLP's outstanding common units plus all of its incentive distribution rights ("IDRs").

At the time of the transaction, defendants Douglas L. Foshee, James C. Yardley, John R. Sult, D. Mark Leland, Ronald L. Kuehn, Jr., William A. Smith, and Arthur C. Reichstetter (together, the "Individual Defendants") constituted the board of directors of the General Partner (the "GP Board"). Four of the Individual Defendants also held management positions with El Paso Parent or the General Partner. Foshee was the President and CEO of El Paso Parent. Yardley served as an Executive Vice President of El Paso Par-

ent and as President and CEO of the General Partner. Sult served as CFO of El Paso Parent and the General Partner. Leland served as an Executive Vice President of El Paso Parent and president of El Paso Midstream Group, Inc., having previously served as the CFO of El Paso Parent and the General Partner. Each of the management directors beneficially owned equity stakes in El Paso Parent that dwarfed their equity stakes in El Paso MLP.

The other three members of the GP Board were outside directors, although two had past ties to El Paso Parent. Kuehn was Interim Chief Executive Officer of El Paso Parent in 2003 and served as Chairman of the Board of El Paso Parent from 2003 until 2009, two years before the challenged transaction took place. Smith was an Executive Vice President of El Paso Parent and Chairman of El Paso Merchant Energy's Global Gas Group until 2002. Reichstetter was the only director without past ties to El Paso Parent.

## B. The Southern Transaction

On February 8, 2011, El Paso Parent proposed to sell to El Paso MLP a 22% general partner interest in Southern for a purchase price of $587 million, excluding debt. Southern is a natural gas pipeline and storage company with a network of approximately 8,000 miles of pipelines extending across the southeastern United States.

At the time of the proposal, El Paso MLP already owned a 60% general partner interest in Southern that it had acquired from El Paso Parent through a series of prior drop-downs, including 10% transferred to El Paso MLP upon its formation, 15% acquired in September 2008, 20% acquired in June 2010, and 15% acquired in November 2010. El Paso Parent's proposal contemplated that El Paso

MLP would finance the purchase with the proceeds from the public issuance of up to 12 million common units, a draw on the Partnership's revolving credit facility, and a cash contribution from El Paso Parent to maintain its 2% general partner interest in El Paso MLP. El Paso MLP had used the same financing structure for prior drop-downs. The proposal gave El Paso MLP the option to purchase an additional 3% interest in Southern on the same terms, depending on the success of El Paso MLP's unit issuance. If El Paso MLP exercised the option, it would acquire in total an additional 25% general partner interest in Southern, for aggregate ownership of 85%.

## C. The Contractual Approval Framework

Because El Paso Parent controlled El Paso MLP through its ownership of the General Partner and also owned the interest in Southern that El Paso MLP would acquire, the proposed transaction created a conflict of interest for the General Partner. The First Amended and Restated Agreement of Limited Partnership for El Paso MLP (the "LP Agreement" or "LPA") establishes contractual requirements for such a transaction.

As authorized by the Delaware Limited Partnership Act, the LP Agreement eliminates all common law duties, including fiduciary duties, that the General Partner, El Paso Parent, or the Individual Defendants might otherwise owe to El Paso MLP and its limited partners. Section 7.9(e) states:

> Except as expressly set forth in this Agreement, neither the General Partner nor any other Indemnitee shall have any duties or liabilities, including fiduciary duties, to the Partnership or any Limited Partner or Assignee and the provisions of this Agreement, to the extent

that they restrict, eliminate or otherwise modify the duties and liabilities, including fiduciary duties, of the General Partner or any other Indemnitee otherwise existing at law or in equity, are agreed by the Partners to replace such other duties and liabilities of the General Partner or such other Indemnitee.

LPA § 7.9(e). The LP Agreement defines the term "Indemnitee" to include the General Partner, "any Person who is or was an Affiliate of the General Partner," and "any Person who is or was a . . . director . . . of . . . the General Partner. . . ." *Id.* § 1.1. Consequently, the General Partner, El Paso Parent, and the Individual Defendants are Indemnitees for purposes of the LP Agreement, and they do not owe any common law duties, including fiduciary duties, to El Paso MLP or its limited partners.

In place of common law duties, the LP Agreement substitutes contractual commitments. Viewed from 20,000 feet, the LP Agreement divides the decisions that the General Partner might make into three broad categories: decisions made by the General Partner in its individual capacity, decisions made by the General Partner in its capacity as the General Partner that do not involve any conflict of interest, and decisions made by the General Partner in its capacity as the General Partner that involve a conflict of interest.

For decisions that the General Partner makes in its individual capacity, the LP Agreement states that the General Partner does not owe any duty to El Paso MLP or any of the limited partners, can act in its own interest, and does not have to believe in good faith that its actions are in the best interests of El Paso MLP. Section 7.9(c) sets forth the relevant contractual language:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its individual capacity as opposed to in its capacity as the general partner of the Partnership, . . . then the General Partner . . . [is] entitled, to the fullest extent permitted by law, to make such determination or to take or decline to take such other action free of any duty (including any fiduciary duty) or obligation whatsoever to the Partnership, any Limited Partner or Assignee, . . . and the General Partner . . . shall not, to the fullest extent permitted by law, be required to act in good faith or pursuant to any other standard imposed by this Agreement . . . [or] any other agreement contemplated hereby or under the Delaware Act or any other law, rule or regulation or at equity.

*Id.* § 7.9(c).

For decisions the General Partner makes in its capacity as the General Partner, but which do *not* involve a conflict of interest, the General Partner must only believe in good faith, subjectively, that its actions are in the best interests of El Paso MLP. Section 7.9(b) sets forth the relevant contractual language:

> Whenever the General Partner makes a determination or takes or declines to take any other action . . . in its capacity as the general partner of the Partnership as opposed to in its individual capacity . . . then, unless another express standard is provided for in this Agreement, the General Partner . . . shall make such determination or take or decline to take such other action in good faith and shall not be subject to any other or different standards (including fiduciary standards). . . . In order for a determination or other action to be in "good faith" for purposes of this Agreement, the Person or Persons making such determination or taking or declining to take such other action must be-

lieve that the determination or other action is in the best interests of the Partnership.

*Id.* § 7.9(b).

At first blush, this standard appears to apply to all decisions made by the General Partner in its capacity as the General Partner. Analytically, however, Section 7.9(b) applies only to decisions made by the General Partner in its capacity as the General Partner that do not involve a conflict of interest, because Section 7.9(b) states that the standard it sets forth will apply "unless another express standard is provided for in this Agreement." *Id.* When a decision involves a potential conflict of interest on the part of the General Partner, Section 7.9(a) provides "another express standard." *See id.* § 7.9(a). Under that section, when the General Partner takes action in its capacity as the General Partner, and the action involves a conflict of interest, then the action will be "permitted and deemed approved by all Partners" and "not constitute a breach" of the LP Agreement or "any duty stated or implied by law or equity" as long as the General Partner proceeds in one of four contractually specified ways. *Id.* In general terms, the four alternatives are (i) good faith approval by a committee composed of disinterested members of the GP Board, (ii) approval by disinterested unitholders, (iii) a judicial finding that the transaction was on arm's-length terms comparable to what a third party would provide, or (iv) a judicial finding that the transaction was fair and reasonable to the partnership. Each resembles one of the traditional common law techniques for cleansing a conflict of interest transaction, but each contractual method is more deferential to the General Partner than the common law analog. The relevant contractual language states:

Unless otherwise expressly provided in this Agreement ..., whenever a poten-tial conflict of interest exists or arises between the General Partner ..., on the one hand, and the Partnership ..., any Partner or any Assignee, on the other, any resolution or course of action by the General Partner ... in respect of such conflict of interest shall be permitted and deemed approved by all Partners, and shall not constitute a breach of this Agreement, ... or of any duty stated or implied by law or equity, if the resolution or course of action in respect of such conflict of interest is (i) approved by Special Approval, (ii) approved by the vote of a majority of the Outstanding Common Units (excluding Common Units owned by the General Partner and its Affiliates), (iii) on terms no less favorable to the Partnership than those generally being provided to or available from unrelated third parties or (iv) fair and reasonable to the Partnership, taking into account the totality of the relationships between the parties involved (including other transactions that may be particularly favorable or advantageous to the Partnership).

*Id.* § 7.9(a).

Within Section 7.9(a), the introductory phrase "[u]nless otherwise expressly provided in this Agreement" is important, because for certain particular types of transactions that involve a conflict of interest on the part of the General Partner, the LP Agreement sets forth a separate and even more specific contractual standard. For example, Section 7.5 governs the outside activities of the General Partner, covering matters that traditionally would fall under the heading of the corporate opportunity doctrine. Section 7.6 of the LP Agreement governs loans by the General Partner to the Partnership or its subsidiaries. Section 7.7 addresses indemnification of the General Partner by the Partnership. For transactions that fall within their

scope, the more specific provisions control in lieu of Section 7.9(a).

For decisions taken by the General Partner in its capacity as such, the LP Agreement thus escalates from an expansive and highly deferential standard for non-conflict transactions (Section 7.9(b)), to a narrower standard for conflict transactions in general (Section 7.9(a)), to more specific standards for certain types of conflict transactions. This structure resembles the analytical progression of fiduciary duty law, where the highly deferential business judgment rule applies to non-conflict transactions, the entire fairness test applies to conflict transactions, and specific standards like the corporate opportunity doctrine apply under particular circumstances. The absence of any contractual duty on the General Partner when not acting in that capacity similarly resembles the ability of a controlling stockholder (otherwise a fiduciary) to vote its shares in its own interest or for reasons of whim or caprice. In this way, the LP Agreement borrows its basic framework from the common law, but replaces the common law rules with contractual standards more favorable to the General Partner.

## D. The Special Approval Process

For the Southern transaction, the General Partner elected to proceed by way of Special Approval. The GP Board established a Conflicts Committee to evaluate El Paso Parent's proposal. Kuehn, Reichstetter, and Smith served as the members of the committee. Reichstetter served as Chair. The committee retained Tudor, Pickering, Holt & Co. ("Tudor") as its financial advisor and Akin Gump Strauss Hauer & Feld LLP ("Akin Gump") as its legal advisor.

On February 9, 2011, the Conflicts Committee held its first formal meeting. After the meeting, Tudor and Akin Gump began conducting due diligence.

On February 15, 2011, the Conflicts Committee met for the second time. Tudor summarized its initial due diligence, noting (i) the status of various developmental and expansion projects involving Southern, (ii) adjustments made to El Paso MLP's financial projections since the prior acquisition of an interest in Southern, and (iii) El Paso MLP's strong financial performance since the earlier transaction.

The Conflicts Committee met again on February 24, 2011. Tudor made a presentation, which included (i) a financial overview of El Paso MLP, its market performance, capital structure, and projected capital expenditures, (ii) a financial overview of Southern, its projected EBITDA, distributable cash flows, and projected capital expenditures, (iii) a comparison of El Paso Parent's prior financial projections for Southern with its most recent projections, and (iv) a comparison of El Paso MLP's debt levels with those of its competitors. Tudor advised that the transaction was expected to be more accretive on a per unit basis to El Paso MLP's common unitholders than previous drop-downs.

The Conflicts Committee next met on February 28, 2011. The members and their advisors discussed the anticipated timing of the transaction and the related public offering.

On March 2, 2011, the Conflicts Committee met in person, and Tudor presented an updated financial analysis. The next day, the Conflicts Committee met for a sixth and final time and approved the transaction. On March 4, the entire GP Board met and, relying on the Conflicts Committee's recommendation, approved the transaction.

On March 8, 2011, El Paso MLP announced publicly that it was acquiring a 22% general partner interest in Southern with the option to acquire an additional 3% interest. That same day, El Paso MLP announced its plan to issue 12,000,000 common units to the public with an underwriters' option to purchase up to an additional 1,800,000 units. All 13,800,000 units were sold. On March 9, El Paso MLP exercised its option to acquire the additional 3% interest in Southern.

### E. This Litigation

On October 24, 2011, the plaintiff made a demand for books and records relating to the March 2011 transaction. In January 2012, El Paso MLP produced copies of minutes from the Conflicts Committee meetings and Tudor's financial analysis. On May 11, 2012, the plaintiff filed his complaint. Counts I and II assert, respectively, class and derivative claims against the defendants for breaching the express terms of the LP Agreement and the implied covenant of good faith and fair dealing. Counts III and IV assert, respectively, class and derivative claims against the GP Board for aiding and abetting the General Partner's purported breaches of the express terms of the LP Agreement and the implied covenant of good faith and fair dealing.

Each count of the complaint turns on the assertion that the Conflicts Committee acted in subjective bad faith when evaluating and approving the March 2011 transaction. The plaintiff contends that the IDRs significantly reduced the economic benefit of the transaction to the unaffiliated limited partners and that Tudor's financial analysis failed to account properly for the IDRs. According to the plaintiff, after taking the IDRs into account, the transaction was actually dilutive, rather than accretive, to the unaffiliated limited partners.

Count I frames this assertion a direct claim that the General Partner failed to comply with the contractual requirements of Section 7.9(a). According to the plaintiff, the General Partner relied exclusively on the Conflicts Committee's grant of Special Approval, but the contractual requirements for Special Approval were not met. The plaintiff concludes that the defendants breached the LP Agreement by proceeding with a transaction that involved a conflict of interest on the part of the General Partner without complying with Section 7.9(a). Count III asserts a claim for aiding and abetting the breach as a direct claim against the other defendants. Counts II and IV advance similar theories as derivative claims.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 23, class certification is appropriate if the case satisfies the four prerequisites of Rule 23(a) and meets one of the requirements of Rule 23(b). *Nottingham P'rs v. Dana,* 564 A.2d 1089, 1094–95 (Del.1989). The defendants agree that if Counts I and III are direct, then the necessary requirements are met. The defendants argue that class certification is inappropriate because Counts I and III assert claims that are exclusively derivative. The court has reviewed independently the requirements for class certification and agrees that they are readily met. The sole question for decision is therefore whether Counts I and III assert direct claims.

■ The test for distinguishing between direct and derivative claims in the limited partnership context is substantially the same as in the corporate context. *Litman v. Prudential–Bache Props., Inc.,* 611 A.2d 12, 15 (Del.Ch.1992). The determination turns on the following two questions: "(1) who suffered the alleged harm (the [partnership] or the suing [unitholders], individ-

ually); and (2) who would receive the benefit of any recovery or other remedy (the [partnership] or the [unitholders], individually)." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

 The plaintiff's description of Counts I and III as direct is not dispositive. The court must "independently examine the nature of the wrong alleged and any potential relief to make its own determination" about the nature of the claims. *Id.* at 1035 (internal quotation marks omitted). The plaintiff's decision to frame similar theories as derivative claims is not dispositive either. Some theories can be asserted either as direct or derivative claims, in which case "[b]oth types of claims may be litigated."[1]

### A. The First Prong Of *Tooley*

To support a derivative characterization, the defendants argue that Counts I and III reduce to the theory that El Paso MLP paid too much for a 25% interest in Southern. That injury, they say, was suffered by El Paso MLP, making the claim derivative under the first prong of *Tooley*. Unfortunately for the defendants, their re-

characterization ignores what Counts I and III allege, which is that the limited partners possessed a contractual right under the LP Agreement to have the defendants comply with Section 7.9(a). Counts I and III contend that the limited partners possessed this contractual right, that the limited partners' contractual right was violated, and that the limited partners therefore suffered the injury under the first prong of *Tooley*.

Pre-*Tooley* cases recognized that a stockholder could assert a direct claim if the cause of action involved "a contractual right of shareholders that is independent of the corporation's rights." *Manzo v. Rite Aid Corp.*, 2002 WL 31926606, at *5 (Del.Ch. Dec. 19, 2002), *aff'd*, 825 A.2d 239 (Del.2003) (TABLE). Classic examples included the right to vote, the right to receive a specified dividend, and the right to own and alienate shares.[2]

*Tooley* did not overrule these cases or alter the longstanding principle that a stockholder suffers injury when its contractual rights are breached. To the contrary, *Tooley* took on a recurring argument advanced by defendants in favor of

---

**1.** *Loral Space & Commc'ns Inc. v. Highland Crusader Offshore P'rs, L.P.*, 977 A.2d 867, 868 (Del.2009); *accord Lipton v. News Int'l, Plc*, 514 A.2d 1075, 1079 (Del.1986) (finding that complaint pled "claims that support both individual and derivative causes of action"); *Sagarra Inversiones, S.L. v. Cementos Portland Valderrivas, S.A.*, 2011 WL 3371493, at *5 n. 31 (Del.Ch. Aug. 5, 2011) ("Although the *Tooley* formulation provides a two-part analysis for determining whether an asserted claim is direct or derivative, there are some limited exceptions where the same facts may support both direct and derivative claims."); *San Antonio Fire & Police Pension Fund v. Bradbury*, 2010 WL 4273171, at *9 n. 68 (Del.Ch. Oct. 28, 2010) ("The same facts may support both direct and derivative claims."); *Thornton v. Bernard Techs., Inc.*, 2009 WL 426179, at *3 n. 28 (Del.Ch. Feb. 20, 2009) ("It is possible for a claim to be both derivative and direct.");

*Odyssey P'rs v. Fleming Co.*, 1998 WL 155543, at *3 (Del.Ch. Mar. 27, 1998) ("[I]n some circumstances, the same conduct (or aspects thereof) may give rise to both derivative and direct claims.").

**2.** *See Lipton*, 514 A.2d at 1078–79 (right to vote); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 78–79 (Del.Ch.1999) (Strine, V.C.) (right to own and alienate shares); *Moran v. Household Int'l, Inc.*, 490 A.2d 1059, 1070 (Del.Ch.), *aff'd*, 500 A.2d 1346 (Del.1985) (discussing classic examples); *see also Turner v. Bernstein*, 768 A.2d 24, 32 n. 20 (Del.Ch.2000) (Strine, V.C.) (observing that the right to declare or compel a dividend has been recognized as a classic example of an action suitable to certification under Rule 23(b)(1)).

characterizing claims as derivative, namely that if all stockholders held the same right, and if all of the stockholders were injured equally, then the claim should be regarded as derivative. *Tooley* rejected this argument, holding that such a claim remains direct.

The facts of *Tooley* are informative. The case involved a third-party, two-step acquisition in which the target corporation consented to the acquirer postponing the closing of the first-step tender offer by 22 days. Stockholder plaintiffs sued, claiming that the stockholders of the target corporation had the right to have the offer close on time. The plaintiffs claimed that if the offer had closed on time, then the stockholders would have gotten their money faster. As damages, the plaintiffs sought the time value of money that the stockholders lost from the delay.

The Court of Chancery dismissed the complaint, reasoning that the claims were derivative and that, despite the plaintiffs' argument to the contrary, there was no meaningful distinction between the tendering and non-tendering stockholders. The decision explained that "[b]ecause this delay affected all DLJ shareholders equally, plaintiffs' injury was not a special injury, and this action is, thus, a derivative action at most." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 2003 WL 203060, at *4 (Del. Ch. Jan. 21, 2003). The Court of Chancery thus treated a contractual claim as derivative if the same contractual right was held by all stockholders and all suffered the same injury to their contractual right

On appeal, the Delaware Supreme Court reversed. The high court's opinion recognized that the concept of "special injury," on which the Court of Chancery relied, was "amorphous and confusing." *Tooley*, 845 A.2d at 1035. The Delaware Supreme Court traced much of the confusion to

*Bokat v. Getty Oil Co.*, 262 A.2d 246 (Del. 1970), in which the Delaware Supreme Court had stated that "a suit must be maintained derivatively if the injury falls equally upon all stockholders." *Tooley*, 845 A.2d at 1037. The *Tooley* decision described this statement as both "confusing and inaccurate." *Id.*

It is confusing because it appears to have been intended to address the fact that an injury to the corporation tends to diminish each share of stock equally because corporate assets or their value are diminished. In that sense, the *indirect* injury to the stockholders arising out of the harm to the corporation comes about solely by virtue of their stockholdings. It does not arise out of any independent or direct harm to the stockholders, individually. *That concept is also inaccurate because a direct, individual claim of stockholders that does not depend on harm to the corporation can also fall on all stockholders equally, without the claim thereby becoming a derivative claim.*

*Id.* at 1037 (second emphasis added). The Delaware Supreme Court then surveyed its subsequent decisions addressing the distinction between direct and derivative claims. The high court found that although the concept of "special injury" was confusing, the decisions correctly recognized that stockholders suffered direct injury and could sue individually when they asserted rights belonging to them *qua* stockholders, even if all stockholders possessed the same rights and were injured in the same way. *Id.* at 1039.

Applying that test to the facts in *Tooley*, the Delaware Supreme Court ruled that the claim asserted was not derivative, even though the defendants' action affected all stockholders similarly, because the right purportedly implicated belonged to the stockholders. *Id.* at 1039. This holding

confirmed the direct nature of a stockholder's cause of action for injury to its contractual rights as a stockholder, even when a plaintiff asserts the same contractual right in a representative capacity on behalf of all stockholders.

Post-*Tooley* cases have held that stockholders suffer direct injury and may sue individually for breach of their contractual rights, even when all stockholders held the same right and suffered the same injury.[3] The decisions recognize that when the certificate of incorporation or bylaws contain a protective provision for the benefit of the stockholders, such as a class vote, consent right, notice right, or other procedural requirement, then the stockholders can sue directly to enforce it. *See Ruffalo*, 2010 WL 3307487, at *9; *MCG Capital*, 2010 WL 1782271, at *7, *13–14.

Stockholders similarly can sue directly to enforce a constraint on the board's authority. In *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951 (Del.Ch. Aug. 16, 2010), Chancellor Chandler considered a claim that a board of directors violated Section 141 of the Delaware General Corporation Law (the "DGCL") by approving an interested loan transaction. The *Grayson* plaintiff argued that the purported board majority that voted on the loan had not validly approved the transaction, in part because two directors were not permitted to participate in the meeting when the board considered the loan. Chancellor Chandler held that this claim was direct for purposes of the first *Tooley* factor because the conduct violated a restriction on board authority established by the DGCL:

> The [DGCL] establishes a structural relationship between the corporation and its officers, directors, and shareholders. Although the DGCL empowers corporate directors and officers to act for the corporation, the DGCL also imposes certain restraints on the use of this authority. If a corporate officer acts in a manner that the DGCL prohibits, then the officer has violated this structural relationship by disregarding the specific restraints placed on him or her by the shareholders. It is consequently the rights of the shareholders, not those of the corporation, that are injured by the encroachment. Thus, any shareholder who was harmed by the violation of the structural relationship established between the corporation and the shareholder is harmed directly and has an individual cause of action.

*Id.* at *5. This analysis is consistent with the Delaware Supreme Court's longstanding recognition that the DGCL, the certification of incorporation, and the bylaws together constitute a multi-party contract among the directors, officers, and stockholders of the corporation.[4] As parties to

3. *See, e.g., Rich Realty, Inc. v. Potter Anderson & Corroon LLP*, 2011 WL 743400, at *4 (Del.Super. Feb. 21, 2011); *Ruffalo v. Transtech Serv. P'rs Inc.*, 2010 WL 3307487, at *9 (Del.Ch. Aug. 23, 2010); *MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *7, *13–14 (Del.Ch. May 5, 2010).

4. *Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del.Ch.2013) ("[O]ur Supreme Court has long noted that bylaws, together with the certificate of incorporation and the broader DGCL, form part of a flexible contract between corporations and stockholders."); *accord Airgas, Inc. v. Air Prods. &*

*Chems., Inc.*, 8 A.3d 1182, 1188 (Del.2010) ("Corporate charters and bylaws are contracts among a corporation's shareholders...."); *STAAR Surgical Co. v. Waggoner*, 588 A.2d 1130, 1136 (Del.1991) ("[A] corporate charter is both a contract between the State and the corporation, and the corporation and its shareholders."); *Centaur P'rs, IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 928 (Del.1990) ("Corporate charters and by-laws are contracts among the shareholders of a corporation ...."); *cf. Lawson v. Household Fin. Corp.*, 152 A. 723, 726 (Del.1930) ("The same rules which govern the construction of

that contract, stockholders can enforce it directly.

As Chancellor Chandler noted, his analysis in *Grayson* comported with *Grimes v. Donald*, 673 A.2d 1207 (Del. 1996).[5] There, the Delaware Supreme Court explained that the plaintiff stated an individual claim against the corporate officials for "violating ... specific restraints imposed" by the DGCL. *Id.* at 1213. The *Grimes* decision also explained that it would be inappropriate for a board of directors to assess the claim under the guise of considering a demand because the question of whether the contractual relationship was violated presented an issue of law:

> Whether these contracts do violate Section 141 is a question of law directly concerning the legal character of the contract and its effect upon the directors. The question whether these contracts are valid or not does not fall into the realm of business judgment; it cannot be definitively determined by the informed, good faith judgment of the board. It must be determined by the court.

*Id.* at 1212 (adopting Court of Chancery's analysis); *accord Grayson*, 2010 WL 3221951, at *6. "Judicial review of such action involves a determination of the legal and equitable obligations of [the fiduciary] towards his principal." *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 660 (Del.Ch.1988) (Allen, C.). As such, it is "not ... a question that a court may leave to the [fiduciary] finally to decide so long as he does so honestly and competently; that is, it may not be left to the [fiduciary's] business judgment." *Id.; accord Gottlieb v. Heyden Chem. Corp.*, 90 A.2d 660, 663 (Del.1952) ("[D]irectors may be mistaken as to the law of a transaction. When a board acts under a misconception of the law on a vital point, judicial review is in order, without there being any question of bad faith.").

Boards of directors have no discretion to exceed the intra-entity limitations on their authority. The possession of discretionary authority is a prerequisite for the policy-based deference of the business judgment rule. Without authority to take the action in question, a board has no business judgment to exercise. Looked at from the opposite perspective, precisely because directors have wide discretion to act within their legal authority, stockholders have a right to insist that directors not take action beyond the limits of that authority. To overlay stockholders' contractual rights with a presumption that boards determine when those rights can be asserted would conflict with our law's long-standing protection of stockholder rights, of which voting rights are an important but by no means exclusive example. Stockholders can assert those rights directly, without first seeking permission from the board.[6]

---

statutes, contracts and other written instruments, are made use of in construing the provisions and determining the meaning of charters and grants of corporate powers and privileges.").

5. In *Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del.2000), the Delaware Supreme Court overruled seven precedents, including *Grimes* and *Aronson v. Lewis*, 473 A.2d 805 (Del. 1984), to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Brehm*, 746 A.2d at 253 n. 13. The *Brehm* Court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. This decision does not rely on any of these decisions for the standard of appellate review and therefore omits the cumbersome subsequent history when citing *Grimes* and, later, *Aronson*.

6. A series of decisions involving Rule 23.1 motions to dismiss has reached the same conclusion implicitly, although ironically within

■ These principles apply to alternative entities. If a limited partnership agreement prohibits the actions that were taken, then the limited partners have standing to enforce the limited partnership agreement directly. *Brinckerhoff v. Tex. E. Prods. Pipeline Co.*, 986 A.2d 370, 383 (Del.Ch.2010). The Delaware Limited Partnership Act states that "[i]t is the policy of this chapter to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements." 6 *Del. C.* § 17–1101(c). Allowing parties to the limited partnership agreement to enforce the agreement as a contract is consistent with the public policy espoused by the act.

That limited partners can sue directly for breach of the agreements to which they are parties does not mean that all intra-entity limited partnership claims become direct. This court's decisions in the limited partnership context have distinguished between suits for breach of the limited partnership agreement and suits challenging the discretion afforded to the general

partner. In *Litman,* limited partners filed suit against the general partners after the limited partnership announced a reduction in its quarterly per-unit distributions. 611 A.2d at 14. The court described the difference between (i) a claim that the general partner had breached a contractual provision governing distributions and (ii) a generic theory that the general partners had "inadequately investigat[ed] and monitor[ed] investments." *Id.* at 16. The complaint asserted only the latter, not the former, and therefore stated a derivative claim. Likewise in the *Cencom* decision, limited partners asserted the contractual claim contemplated by *Litman,* arguing that the general partner breached Section 7.3 of the limited partnership agreement by improperly terminating their priority distributions. *In re Cencom Cable Income P'rs, L.P. Litig.,* 2000 WL 130629, at *3 (Del.Ch. Jan. 27, 2000). The court agreed that the limited partners had stated a direct claim for violation of their contractual right. *Id.* So too in the *Anglo American*

the framework of a demand futility analysis. These cases hold that when a board violates contractual limits on its authority, that decision is not a business judgment to which deferential fiduciary duty review applies, rendering demand futile under the second prong of *Aronson.* In my view, the same reasoning demonstrates that the claim is not derivative at all. The analytical implication has not proved salient in the Rule 23.1 context because for purposes of a motion to dismiss, the endpoint is the same: the plaintiff can proceed with the lawsuit. *See Weiss v. Swanson,* 948 A.2d 433, 441 (Del.Ch.2008) (recognizing authority claim as a basis for demand futility under the second prong of *Aronson* because "[a]lthough the defendants are correct that compensation decisions are typically protected by the business judgment rule, the rule applies to the directors' grant of options pursuant to a stockholder-approved plan only when the terms of the plan at issue are adhered to"); *Ryan v. Gifford,* 918 A.2d 341, 355 (Del.Ch.2007) (recognizing authority claim as a basis for demand futility under the

second prong of *Aronson* because "the alleged facts suggest that the director defendants violated an express provision of two option plans and exceeded the shareholders' grant of express authority"); *Cal. Pub. Empls.' Ret. Sys. v. Coulter,* 2002 WL 31888343, at *10 (Del.Ch. Dec. 18, 2002) (holding that "[t]he business judgment rule may not be invoked to shelter unauthorized actions of a board of directors" and excusing demand under the second prong of *Aronson* ); *id.* at *11 (explaining that "[a]ny action of the board that falls outside the rather broad scope of its authority is not entitled to the protection of the business judgment rule," causing demand to be excused); *Sanders v. Wang,* 1999 WL 1044880, at *5 (Del.Ch. Nov. 8, 1999) (noting that "each plaintiff's core allegation [is] that the board exceeded its authority" and finding that "the plaintiffs have sufficiently pleaded facts which cast doubt that the board's alleged acts could be the result of a valid exercise of business judgment," and "[t]herefore, demand [was] excused").

case. *Anglo Am. Sec. Fund, L.P. v. S.R. Global Int'l Fund, L.P.,* 829 A.2d 143, 151 (Del.Ch.2003). The limited partners asserted that the general partner breached the terms of the limited partnership agreement when withdrawing funds from its capital account, and the court held that the breach of contract claim was direct. *Id.* at 153. The court also held that the plaintiffs stated a direct claim when they asserted that the general partner failed to provide a contractually required year-end report. *Id.* at 154.

Here, the plaintiff has not argued simply that the Partnership paid too much for a 25% interest in Southern. If that had been the plaintiff's argument, then, as in *Litman,* the claim would have been derivative. *See Litman,* 611 A.2d at 16; *accord Gerber v. EPE Hldgs., LLC,* 2013 WL 209658, at *12 (Del.Ch. Jan. 18, 2013). Instead, Counts I and III rely on the limited partners' contractual rights under Section 7.9(a) of the LP Agreement, which requires that the General Partner follow one of four specified paths before a transaction posing a conflict of interest for the General Partner can comply with the LP Agreement. As in the analogous corporate cases, the plaintiff contends that the General Partner exceeded its authority by proceeding with the transaction in violation of Section 7.9(a), and the plaintiff claims a direct injury in the form of a breach of the limited partners' contractual rights. Because the limited partners suffered an injury to their contractual rights, the first prong of *Tooley* supports characterizing Counts I and III as direct claims.

## B. The Second Prong Of *Tooley*

To establish a derivative characterization under the second prong of *Tooley,* the defendants again portray Counts I and III as contending that El Paso MLP paid too much for a 25% interest in Southern.

According to the defendants, the logical remedy should be for El Paso Parent to pay back some of the money to El Paso MLP. Because this remedy would flow to El Paso MLP, the defendants conclude that *Tooley* second prong supports treating Counts I and III as derivative.

The defendants have identified one possible remedy that the plaintiff might obtain (El Paso MLP gets cash), but not the only possible remedy. El Paso Parent, through the General Partner, owns a significant percentage of the equity of El Paso MLP. In the *Gaylord* decision, Chief Justice Strine, writing as a Vice Chancellor, questioned the propriety of awarding damages to the entity (and the resulting derivative characterization) where the alleged wrongdoers owned a significant stake in the entity. If the defendants were proven to be wrongdoers, he asked, "should [they] be entitled to recover damages for the economic injury they inflicted on themselves"? *Gaylord,* 747 A.2d at 80. He then reasoned, "If the answer is no because of the fact that they created the harm, this factor would support awarding relief to the class of innocent stockholders, not to the corporation." *Id.* As the Chief Justice recognized, such a remedy is both feasible and supports an individual characterization. *Id.* The same reasoning applies in this case. If El Paso Parent and the General Partner are proven to be wrongdoers, this factor would support awarding relief to the class of innocent unitholders, not to El Paso MLP.

And there is another alternative. The plaintiff's underlying merits theory asserts that the Conflicts Committee violated Section 7.9(a) by consciously ignoring the implications of El Paso MLP's IDRs, thereby acting in bad faith.

> IDRs are structured so that when distributions from the Partnership increase, the percentage of cash received by the

IDRs increases. IDRs incentivize a general partner, whose economic general partner interest in the MLP is otherwise fixed and relatively small, to manage the MLP to maximize cash flow for the LP units. The IDRs are a form of pay for performance, with performance measured in distributable cash. In MLP lingo, as the operating partnership performs better, the general partner "rides up the splits" and receives a greater share of the incremental cash generated by its efforts. . . .

While helpful as a means of incentivizing general partner performance and aligning interests, IDRs have downsides. Most obviously, the overhang of the IDR claim on cash flows limits the distributions available to the LP units. This reduces the attractiveness of LP units, resulting in a lower trading price and making them less attractive as a source of new money or as an acquisition currency. Equally important, as the operating partnership performs better, the increasing IDR claim drives up its cost of equity capital, which limits its ability to undertake new projects.

*Lonergan v. EPE Hldgs., LLC,* 5 A.3d 1008, 1012–13 (Del.Ch.2010) (footnote omitted). If the plaintiff succeeds in proving that the IDRs caused the harm, then possible remedies might include enjoining the General Partner from receiving benefits from some or all of its IDRs, invalidating a portion of the General Partner's IDRs or common units, or addressing the matter through changes to the partnership agree-

ment. These and other possible remedies could operate at the unitholder level, without any payment to EL Paso MLP.[7] At this phase of the case, it is premature to rule out these or other possible remedies under the guise of a motion for class certification.

Under the second prong *Tooley,* therefore, the remedy could support a derivative characterization or a direct characterization. Because this aspect of *Tooley* does not point definitively in either direction, the first *Tooley* factor takes on added significance, as does the longstanding recognition in *Tooley* and other decisions that investors can sue directly for violations of their contractual rights.

## III. CONCLUSION

Counts I and III of the complaint assert direct claims based on the breach of a protective provision in the LP Agreement. The plaintiff has standing as a party to the LP Agreement to pursue this claim for breach of contract directly. The plaintiff has moved for class certification and made a *prima facie* showing that this action should be certified. Except for arguing that the plaintiff's claims are exclusively derivative, a position this decision rejects, the defendants do not otherwise dispute that class certification is appropriate. The court independently finds that the requirements of Rule 23(a) are satisfied and that class certification under Rules 23(b)(1) and 23(b)(2) is proper. The plaintiff's motion

---

7. *Carsanaro v. Bloodhound Techs., Inc.,* 65 A.3d 618, 656–57 (Del.Ch.2013) (explaining that a "remedy could operate at the stockholder level, without any payment to the corporation, by adjusting the rights of the stock or invalidating a portion of the shares"); *see In re Loral Space & Commc'ns Inc.,* 2008 WL 4293781, at *32 (Del.Ch. Sept. 19, 2008) (reforming securities purchase agreement to convert preferred stock into non-voting common stock), *aff'd sub nom. Loral Space & Commc'ns, Inc. v. Highland Crusader Offshore P'rs, L.P.,* 977 A.2d 867 (Del.2009); *Linton v. Everett,* 1997 WL 441189, at *7 (Del.Ch. July 31, 1997) (invalidating shares that directors issued to themselves for inadequate consideration).

is granted. An implementing order will be
entered.